38303. DALON CONTRACTING COMPANY, INC.
*et al. v.* ARTMAN.

DECIDED MAY 25, 1960—REHEARING DENIED JUNE 10, 1960.

*Moise, Post & Gardner, McChesney H. Jeffries, Smith, Field, Ringel, Martin & Carr, Sam F. Lowe, Jr.,* for plaintiffs in error. *John David Jones, James H. Moore,* contra.

TOWNSEND, Judge. ■ The Artmans purchased their home in February, 1958, and moved in during the latter part of March of the same year. Prior to taking possession they had the front part of the house interior redecorated, and the plaintiff himself painted the bedrooms. There were some few cracks in the plaster at that time, all but one or two of which were repaired and repainted. The house was in the $13,000-$14,000 class, of frame construction with wood flooring, and walls of Gypsum board over which was placed a thin layer of plaster about 1/16 of an inch thick. It was built on sloping land on a cement block foundation nine feet in depth, above soil level in the rear and below soil level in the front, and the lower floor had been converted into a terrace apartment which was in good condition, with some few cracks visible, and had been redecorated several months previously. Between May 1, and November 29, 1958, the defendant Henry C. Beck Company, its subcontractor Dalon Contracting Company, and that defendant's subcontractors Smith & Riddle and Dalon & Brown Pipe Layers, Inc., set off numerous blasts of dynamite in order to remove rock from the construction sites of the six contemplated buildings for footings, tunnels, elevator pits and sewer ditches. Under the defendants' evidence the largest shots set off at any one time consisted of 125 pound loads, and the locations nearest to the plaintiff's home were either 240 feet or 300 to 400 feet from the residence, depending upon

which version of the defendants' evidence the jury chose to believe. By November, 1958, 86 to 90 cracks had appeared in the walls of the plaintiff's home, of which not over 13 were old cracks or reopened cracks; some cracks were 15 to 17 feet long; in some cases plaster fell. Blasts were set off many times a day and on many consecutive days; there would be a lull in operations from time to time followed by renewed frequent blasting. The blasts rattled windows and dishes; felt, according to several witnesses, like a small earthquake; were loud enough to cause persons present to think a water heater had exploded in the house; sent dirt and debris flying through the neighborhood; on two occasions sent rocks through the roofs of neighboring homes; shook a curtain rod from a wall. Numerous new cracks appeared also in the downstairs apartment. Four property owners in the neighborhood testified to similar cracks appearing in houses owned by them and about the same distance or farther away from the blasting site than the plaintiff's home during the same period of time. Generally the cracks would appear as small cracks, and would continue to lengthen and widen as the blasting continued. Complaints were made to the building superintendent, Gordon Wilson, by the plaintiff and other property owners but no change in technique or frequency was noticed thereafter. After the blasting ceased no new cracks appeared. Two expert witnesses testified at length for the defendant and one for the plaintiff; these men agreed that damage may be caused to houses as a result of dynamite blasts either from concussion waves through the air or vibration waves through the earth; that the blasts were not sufficient to cause concussion damage; that blasting which is severe enough to cause characteristic damage leaves a pattern of cracks of a type not apparent in the plaintiff's house; that the type of earth or rock where the blasting occurs will affect its damage potential, as well as the strength of the charge and the manner in which it is detonated, and that vibration damage occurs as a result of stress resulting from the impact of energy waves transmitted through the earth. They differed as to whether the blasting in question could have caused the cracks which appeared in the plaintiff's house, the defendants' witnesses testifying positively that it could not, and one of them analyzed each of

the approximately 90 cracks, and accounted for its presence on the basis that it was an old crack, that it was the result of earth settling, or termite damage, or improper support, either originally or as the result of installing a heating system, or wet rot, or splicing of wallboard, or other named causes. The plaintiff's witness, on the other hand, while agreeing that these conditions, if they existed, would cause areas of stress, testified on the theory that where those areas of stress were not in themselves sufficient to cause visible damage, the areas of weakness in the structure would be first attacked and damaged by the super-added stresses set up by the blasting, and that in his opinion there was a causal relation between the two.

The defendants contend that the evidence is insufficient to support the verdict for the reason that it is circumstantial in character; that it demands a pyramiding of inferences, and that it points no more strongly to the cause of the cracks being the dynamiting than to any of the other reasons given for their appearance by the witnesses for the defendants. It is true that circumstantial evidence, to be sufficient on review, must tend in some proximate and reasonable degree to establish the conclusion claimed and also to render less probable all inconsistent conclusions. *Chancey v. Shirah*, 96 Ga. App. 91, 93 (99 S. E. 2d 365). If a witness sees a truck hit a wall which is standing, and immediately thereafter that wall crumbles, the sense of vision produces direct evidence that the truck has injured the wall. If, however, a house is subject to earth vibrations, and thereafter, not immediately but rather progressively and after some delayed period of time which may be hours or days, the walls of the house show evidence of damage, the causative influence of the blast cannot be proved directly by the sense of vision or touch and the evidence becomes in a sense circumstantial. Where, however, from all of the evidence it appears that the same effect appeared not alone in one house, but to some degree in other houses similarly situated, and where although an attempt is made to ascribe the damage as resulting from a variety of causes other than that in question, which would not necessarily or even normally have commenced and ceased simultaneously with the single force shown by the plaintiff's evidence to have been capable of causing the damage, then the jury may well believe that

the single force, rather than the multitude of unrelated and coincidental causes suggested by the defendant, was the precipitating proximate cause of the damage. They might well have believed the testimony of all the expert witnesses, have found that stresses other than the blasting were also at work in the plaintiff's house, but concluded that the actual damage was triggered by the superadded force attributable to blasting alone, there being no other superadded force in evidence which would have simultaneously affected the plaintiff's home and other houses in the neighborhood during the precise period in time in which the cracks appeared. "Wrongful damage to real property caused by a concussion from blasting with dynamite is direct, and constitutes a trespass to realty. . . In a civil case circumstantial evidence will support a verdict if it preponderates to the hypothesis upon which the plaintiff's right of recovery is based. Where the plaintiff is entitled to recover any part of the sum sued for, a verdict for the defendant cannot be directed." *Ready-Mix Concrete Co. v. Rape*, 98 Ga. App. 503 (1, 4, 5) (106 S. E. 2d 429). The evidence does not require a pyramiding of inferences in order to sustain the verdict. The motions for judgment notwithstanding the verdict and for a new trial on the general grounds are without merit.

■ One expert witness testified that it would cost $1,187 to repair the upstairs of the Artman residence and $511 to repair the downstairs. This witness did not differentiate between the repair of cracks previously existing and those admittedly first appearing during the period of blasting operations, and it is accordingly contended that there was no evidence to support the verdict in the sum of $850 for actual damages. Questions of value are particularly for the jury, who are not bound even by uncontradicted evidence, but may, when the facts appear upon which the opinion is based, exercise their own knowledge and judgment in the light of their own experience. Code § 38-1709; *Georgia Northern Ry. Co. v. Battle*, 22 Ga. App. 665 (97 S. E. 94). The jury had before it a photograph of most, if not all, of the cracks in the plaintiff's house which constituted the damage for which he sought reparation; they had detailed information from various witnesses as to the nature, extent and severity of each, and whether it was a new or pre-existing defect. The actual

■

damages awarded were less than half the amount estimated by the witness. The jury had ample evidence upon which to arrive at an amount for actual damages, and a new trial is accordingly not required for this reason.

■ It is next contended that, while the action was brought against both defendants jointly, the evidence showed that although the defendant Henry C. Beck Company would be responsible for damage caused by itself or its subcontractor Dalon Contracting Company, and Dalon would be liable for damage caused by itself, Dalon would not be liable for any damage caused directly by Beck, and accordingly, since the evidence shows that some undeterminable amount of the blasting was done directly by Beck, a joint verdict against both defendants is unauthorized and must be set aside, the damage to some degree being several rather than joint and several. During the trial of this case there was no effort to separate the blasting done by one defendant from that done by the other or under its control. The case was not tried on this theory. All of the evidence shows a close working relation between the two companies, and much of it tends to show joint control and authority. Most of the blasting was done by Dalon Contracting Company or its subcontractors. Prior to trial the plaintiff addressed individual interrogatories to each defendant containing a question as follows: "Please state the nature and type of any and all explosives used *by you or in your behalf* in the construction of the Communicable Disease Center on Clifton Road, including the brand name of such explosive, and the place from which the same was purchased, giving date or dates of such purchases." The defendants filed a single joint answer to the two sets of interrogatories, and in reply to the question stated: "Defendants are unable at this time to respond in detail to this interrogatory except to state that the explosives used were standard dynamite and blasting powder." Attached to the joint answer, in reply to another question, is a detailed list of blasts. Nowhere did the defendants indicate a several rather than a joint responsibility for any of these blasts. They listed five men as having set off dynamite blasts during the operations. Of these Smith, who did no dynamiting after May 6, made a few shots for the building footings and tunnel but it does not appear

on whose behalf this was done. Akin, who blasted for the footings, tunnel, and elevator pit, testified that he was employed by Smith & Riddle, as presumably was D. V. Riddle who blasted one day on the tunnel and one day at the sewer ditch. James Turner was employed by Smith & Riddle beginning in April, or May, but worked for Beck for about 2 weeks and "volunteered" to set off some shots for the footings, sewer ditch, and tunnel. Fred Brown, who set off a majority of all the blasts, was employed by Dalon & Brown Pipelayers, Inc., and did all of his work on the sewer ditch. Dalon under its contract with Beck undertook to do all of the excavation work, storm drainage and sanitary outside work; it thus appears that Dalon was responsible for all of the earth and rock moving by virtue of this contract, and whether it individually did all of the blasting through its subcontractors or whether in some few isolated instances dynamite was set off by men employed at the moment directly by Beck is of little consequence. This case thus differs from *City of Atlanta v. Cherry*, 84 Ga. App. 728 (67 S. E. 2d 317), where it was held that there was no joint concert of action between various airline companies simply because all used the same airport in such a way that each individually inflicted damage on the plaintiff's property, but in such case each would be liable, if at all, only for the damage attributable to its own flights.

As to the award of punitive damages, the plaintiffs in error rely on cases such as *Lawrence v. Atlanta Gas Light Co.*, 49 Ga. App. 444 (176 S. E. 75) wherein it is stated: "An act of a person although without legal right or authority, upon the person or property of another, which causes damage, where done in good faith and without wilfulness or malice, or such gross neglect as to indicate a wanton disregard for the rights of another, will not authorize the infliction of punitive damages." Since the evidence shows that after complaints were received by the superintendent in charge, Wilson, he instructed at least some of the persons doing the blasting to "hold the blasts down," it is contended that there is no showing of aggravating circumstances in the act or the intention such as to authorize an award of additional damages under Code § 105-2002. *Hughes v. Bivens*, 31 Ga. App. 198 (121 S. E. 590) defines these words as meaning wilful

misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences. Yet what conduct will meet this description is ordinarily a question for determination by the jury and not one of law for the court. There was certainly no malice involved in setting off blasts of a character to injure the plaintiff's residence. There was no intent to injure in the sense that the defendants intended to destroy the plaintiff's property and did acts with that purpose in mind. They did, however, knowingly continue to do the acts which they had been informed were inflicting damage, and which acts, if they were inflicting damage as claimed, constituted a trespass under the decision in *Ready-Mix Concrete Co. v. Rape*, 98 Ga. App. 503, supra. That case further states, at page 509: "If a person commits a trespass with knowledge that he is acting without right, exemplary or punitive damages may be awarded . . . evidence that the trespass was committed upon property which the defendant knew belonged to another would be sufficient for this purpose." Wilful misconduct, then, results from the act itself as well as from the intention. Or, as stated in *Flint Explosive Co. v. Edwards*, 86 Ga. App. 404, 413 (71 S. E. 2d 747), it may be an "actual intent to expose another to a known danger, especially the danger it was contended caused the injuries." In *Savannah Electric & Power Co. v. Horton*, 44 Ga. App. 578 (2) (162 S. E. 299) it is held: "While it may be true that the burden is upon the plaintiff to prove that the trespass was wilful (*Milltown Lumber Co. v. Carter*, 5 Ga. App. 344 (3), 63 S. E. 270), evidence that the trespass was committed upon property which the defendant knew belonged to another would be sufficient for this purpose."

There was testimony from which the jury here could have found that Wilson, after being informed of the damage inflicted, made no effort to cut down the size of the blasts, but only the amount of noise; that this is done by covering the shots with more earth; that this reduces air concussion but builds up earth vibration; that at least one of the dynamiters was consistently using an unnecessary amount of dynamite because of his impression that he was dealing with one-third pound sticks when

in fact the dynamite was divided into one-half pound sticks; that so much dynamite was used that on one occasion it ripped holes in a blasting mat made of half-inch woven steel cable; that after the complaints were made there was no change in the number or intensity of the blasts; that they continued for a period of six or seven months and the damage was progressive; that no investigation was made prior to the commencement of blasting as to the condition of the houses in the neighborhood or the composition of the earth; that after complaints were received there was no investigation of the homes by the defendants for the purpose of determining whether or not damage was in fact being done; that the superintendent himself stated he knew of no change made in the amount of explosives being used on the site after the complaints were received. Under these facts, if the defendants trespassed there is no doubt but that the trespass was wilful under the meaning of Code § 105-2002. Trespass, in cases of explosion, can be shown only by the physical hurling of objects such as rocks, pebbles and debris, or by damage resulting from physical vibrations. That debris continued to fly through the air after the complaints were made is uncontested. The plaintiff's witnesses testified that damage to the house also continued unabated. The defendants' contention was not so much that they attempted to rectify a situation which had caused damage, but that no such situation existed in the first place. If it did exist, it also continued to exist, and thus a case was made for the award of punitive damages as for wilful trespass.

The trial court did not err in denying the motions for a new trial and for a judgment notwithstanding the verdict.

*Judgment affirmed. Gardner, P. J., Carlisle and Frankum, JJ., concur.*